# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ANA PALOMARES, JAIME CAMARENA, )
FLORINDA MUNOZ, SILVIA ROSALES, )
LILIANA SERRANO, JOSEPHINE SANCHEZ )
and GILBERT SANCHEZ, )
    Plaintiffs, )
) Case No. 10 cv 6124
v. )
) Judge Sharon Johnson Coleman
SECOND FEDERAL SAVINGS and LOAN )
ASSOCIATION OF CHICAGO d/b/a )
SECOND FEDERAL SAVINGS, )
    Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Ana Palomares, Jaime Camarena, Florinda Munoz, Silvia Rosales, Liliana Serrano, Josephine Sanchez and Gilbert Sanchez ("Plaintiffs") now move for partial summary judgment as to Counts I and II of their respective amended complaints. Defendant Second Federal Savings and Loan Association of Chicago d/b/a Second Federal Savings ("Second Federal") also moves for summary judgment on Counts I and II of Plaintiffs' amended complaints.[1] For the reasons contained herein, Plaintiffs' motion is denied and Second Federal's motion is granted.

**Background**

At some point in 2009, Second Federal determined that it would engage in a reduction in force ("RIF") and subsequently developed a severance policy. Prior to making any severance payment, Second Federal was required to obtain approval, or a non-objection, from the Office of Thrift Supervision ("OTS").

On April 15, Second Federal submitted a severance proposal to the OTS. Under this proposal, employees would generally be entitled to one week of severance for every full year of service, up to a maximum of 26 weeks of severance pay. Employees over 40 years old would be entitled to two additional weeks, and Second Federal intended to offer separate agreements for

---

[1] All Plaintiffs, except Jaime Camarena, allege additional individual claims against Second Federal. Second Federal has filed separate motions for summary judgment for these individual claims and a separate decision of these motions is being issued contemporaneously with this opinion.

1

two or three executive officers. The cost of the RIF under this proposal was approximately $500,000 to 525,000. The OTS ultimately objected to the proposal.

On June 8, Second Federal submitted a second severance proposal to the OTS. Under this proposal, an employee's severance payment was determined by job category and length of service, as follows:

| Job Category | Length of Service | Severance |
| --- | --- | --- |
| Executive Management | Employed less than 1 year | 2 weeks |
| | Employed 1-5 years | 8 weeks |
| | Employed 5-30 years | 16 weeks |
| | Employed more than 30 years | 26 weeks |
| All Employees | Employed less than 1 year | 2 weeks |
| | Employed more than 1 year | 4 weeks |

"Executive Management" was defined as the chief executive officer, the chief operating officer, senior officers who report directly to either of those positions and other officers who participate in major policy making decisions by appointment to the board of directors. (Dkt. #106, Def.'s Mot. for Summ. J., p. 1, fn. 1; Dkt. #107, Def.'s Stmt. of Facts, ¶26.) The estimated cost of the second proposal was approximately $200,000. The OTS did not object to the proposal and, on September 8, 2009, Second Federal terminated 20 employees.

All 20 employees were offered severance packages pursuant to the severance plan. Only three of the terminated employees fit the definition of "Executive Management," and received between 8 and 26 weeks of severance pay. All three are non-Hispanic. The seventeen terminated employees who did not fit the definition of Executive Management each received four weeks of severance pay. Two are non-Hispanic and fifteen, including Plaintiffs, are Hispanic. At the time of the RIF, Ana Palomares had worked for Second Federal for 10 years; Jamie Camarena for 13 years; Florinda Munoz for 28 years; Silvia Rosales for 23 years; Liliana Serrano for 8 years; Josephine Sanchez for 31 years; and Gilbert Sanchez for 14 years. According to Plaintiffs, they would have received between 16 and 26 weeks of severance if the severance policy been applied to each employee without regard to job category.

On March 4, 2010, Plaintiffs filed formal charges of discrimination with the Illinois Human Rights Department ("IHRD") and with the Equal Employment Opportunity Commission

("EEOC").[2] Plaintiffs received their right to sue letters from the EEOC on August 25, 2010. The IHRD failed to issue a report of findings within 365 days. Plaintiffs filed their initial complaints on September 24, 2010, which were amended on August 16, 2011.

Counts I and II of Plaintiffs' amended complaints each allege discrimination based on national origin and ancestry, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. ("Title VII") and the Illinois Human Rights Act, 775 ILCS 5/2-101 *et seq*. ("IHRA"). Plaintiffs allege Second Federal's severance policy disparately impacted terminated Hispanic employees. The parties each move for summary judgment on Counts I and II of Plaintiffs' amended complaints.

**Legal Standard**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id*. at 255. The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id*. at 325.

**Analysis**

In Counts I and II of each of their amended complaints, Plaintiffs allege the severance policy was discriminatory in violation of Title VII and IHRA because it had a disparate impact against Hispanic employees terminated on September 8, 2009. Discrimination claims brought pursuant to the IHRA are routinely analyzed under the same framework as Title VII. *Rabe v.*

---

[2] Plaintiffs subsequently filed technical amendments correcting their formal charge with the IDHR and EEOC from discrimination based upon race to discrimination based upon ancestry.

*United Air Lines, Inc.*, 971 F. Supp. 2d 807, 821 (N.D. Ill. 2013), *appeal dismissed* (Mar. 6, 2014) (*citing Zaderaka v. Ill. Human Rights Com'n*, 131 Ill.2d 172, 178 (1989)).

To make out a claim for disparate impact, a plaintiff must establish that a particular employment practice causes a disparate impact on a member of a protected class. 42 U.S.C. §2000e–2(k); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012); *Adams v. City of Chicago*, 469 F.3d 609, 613 (7th Cir. 2006). To satisfy this burden, a plaintiff is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988); *Puffer*, 675 F.3d at 717. A plaintiff must also establish causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson*, 487 U.S. at 994–95. Liability under a disparate impact theory does not require proof of intent to discriminate. *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 215 (2010). Only if the plaintiff succeeds in establishing disparate impact does the burden shift to the defendant-employer to demonstrate that the employment practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. §2000e–2(k)(1)(A); *see also Lewis*, 560 U.S. at 212-214. If the employer satisfies this requirement, the burden shifts back to the plaintiff to show that an equally valid and less discriminatory practice was available that the employer refused to use. *Adams*, 469 F.3d at 613; *Puffer*, 675 F.3d at 717.

Plaintiffs argue they are entitled to summary judgment on Counts I and II because the two tests Second Federal used to determine severance pay – length of service and job category – resulted in a disparate impact on terminated Hispanic employees. Plaintiffs suggest that a single, uniform and objective length of service test, like the first proposed severance policy, would have resulted in equal treatment of all terminated employees. Plaintiffs claim Second Federal arbitrarily inserted and defined the Executive Management job category with more favorable severance offerings, which categorically excluded all terminated Hispanic employees from receiving more than four weeks of severance pay. Plaintiffs do not dispute that they do not meet the definition of "Executive Management."

As applied to the 20 employees in the RIF, Plaintiffs contend that the only terminated employees eligible to receive more than four weeks of severance pay were non-Hispanic. Plaintiffs insist the fact that zero terminated Hispanic employees were eligible for or offered

4

more than four weeks of severance pay under the severance policy evidences the "inexorable zero"[3] exists in this case and irrefutably supports their disparate impact claim. (Dkt. #137, Pl.'s Mot. for Partial Sum. Judgment, pp. 11-12.) Second Federal maintains that Plaintiffs wholly fail to meet their burden to show that the severance policy had a statistically significant disparate impact on Hispanic employees and argues that Plaintiffs' reliance on the "inexorable zero" is misplaced at best.

Plaintiffs primarily rely on rely on *Barner v. City of Harvey*, 1998 WL 664951 (N.D. Ill. Sept. 18, 1998), in support of their "inexorable zero" argument. However, *Barner* is factually distinguishable. In *Barner*, 69 employees – 68 of whom were African American – were separated from defendant-employer for "budgetary reasons" over a three month period of time following the election of a new Mayor. 1998 WL 664951. The single white employee apparently chose to retire. *Id*. at *50. The district court found that, while plaintiffs' proffered analytical evidence lacked statistical sophistication, "the 'inexorable zero' speaks volumes and clearly supports an inference of discrimination." *Id*. Here, Plaintiffs have offered no statistical evidence but rest solely on the assertion that zero Hispanic employees were eligible for more than four weeks of severance pay.

Second Federal insists that Plaintiffs' assertion that zero Hispanic employees were eligible for more than four weeks of severance pay is factually incorrect. Second Federal stands on the position that nine employees – eight non-Hispanic and one Hispanic – fit the definition of Executive Management at the time of the RIF. All nine were eligible for between two and 26 weeks of severance pay. Additionally, Second Federal maintains that the severance policy as applied was, in fact, not discriminatory against Hispanic employees. At the time of the RIF, Second Federal had 85 employees. Of the 76 employees who did not fit the definition of Executive Management nine (or 12%) are non-Hispanic and 67 (or 88%) are Hispanic. (*See* Dkt. #107, ¶42; Dkt. #144, Def.'s Resp. Br., p. 2; Dkt. #146, Def.'s Stmt. of Add'l Facts, ¶19.) All were eligible for between two and four weeks of severance pay regardless of national origin. Second Federal asserts that seventeen non-executive employees were terminated, including two

---

[3] The Supreme Court first recognized the concept of the "inexorable zero" in *International Board of Teamsters v. United States*, 431 U.S. 324 (1977). In *Teamsters*, the defendant-employer was alleged to have engaged in a pattern or practice of discriminating against minority employees hired as servicemen or local city drivers (lower-paying and less-desirable jobs), rather than as long-distance line drivers, which went to whites, despite being located in communities with large minority populations. 431 U.S. at 329. The Court observed that "fine tuning of the statistics could not have obscured the glaring absence of minority line drivers" because the defendant's "inability to rebut the inference of discrimination came not from a misuse of statistics but from 'the inexorable zero'." *Id*. at 337 fn. 17.

5

(12%) non-Hispanic and 15 (88%) Hispanic employees. (*Id.*) As a result, Second Federal claims non-Hispanic and Hispanic employees were treated the same under the severance plan at the time of the RIF.

The Court finds that while the severance policy may have adversely affected terminated Hispanic employees more harshly than terminated non-Hispanic employees, Plaintiffs fail to carry their burden of establishing causation. As applied here, the fact only non-Hispanic employees were ultimately offered severance pay according to the Executive Management schedule does not make this a case of the "inexorable zero." Therefore, Plaintiffs fail to carry their initial burden at summary judgment and their motion is denied.

Even if Plaintiffs could meet their initial burden, the Court finds that Second Federal proffers nondiscriminatory reasons for their employment decisions. 42 U.S.C. §2000e–2(k)(1)(A). First, Second Federal disputes that its definition of "Executive Management" was arbitrary as it "virtually mirrors" the federal banking definition of "Senior Executive Officer." (Dkt. #106, p. 9; Dkt. #144, p. 10.) Second Federal defined Executive Management as:

> The chief executive officer, the chief operating officer and the senior officers who report directly to either of those positions and any other officer who participates in major policymaking decisions through appointment to the board of director. (Dkt. #106, p. 1, fn. 1; Dkt. #107, ¶26.)

Federal banking regulations define "Senior Executive Officer" as:

> Senior executive officer means an individual who holds the title or performs the function of one or more of the following positions (without regard to title, salary, or compensation): president, chief executive officer, chief operating officer, chief financial officer, chief lending officer, or chief investment officer. Senior executive officer also includes any other person identified by the OTS in writing as an individual who exercises significant influence over, or participates in, major policymaking decisions, whether or not hired as an employee. 12 C.F.R. §563.555

Second Federal asserts that offering more severance to executives is common business practice as it takes executives longer to find other employment and was here intended "to recognize the executives' greater lever of contribution relative to their level of responsibility." (Dkt. #144, p. 10.) Plaintiffs attempt to discredit Second Federal's position because Nadine Simko, a terminated Executive Management employee, allegedly never had any job duties and was unqualified for her position. However, this fact is irrelevant to the Court's analysis and to Plaintiffs' case. *Holmes v. Potter,* 384 F.3d 356, 361-62 (7th Cir. 2004) (federal courts "do not sit as a super-personnel department that reexamines an entity's business decision and reviews the propriety of

that decision"). Indeed, the determination to offer Ms. Simko more generous severance pay was not dependent on her job performance or qualifications, but on her job title. Plaintiffs cannot and do not dispute that at the time of the RIF, Ms. Simko was an Executive Vice President and served on the Board of Directors – thus meeting the definition of "Executive Management."

The Court finds that Second Federal's rationale to offer terminated Executive Management employees higher severance benefits is nondiscriminatory and consistent with business norms and necessity. Thus, the burden shifts back to Plaintiffs to show that an alternative employment practice existed that Second Federal refused to adopt. Plaintiffs fail to carry this burden. On one hand, Plaintiffs argue that Second Federal had sole discretion in setting and controlling the cost of the reduction in force because OTS did not provide any guidelines on how to reduce the cost of the compensation package. On the other hand, Plaintiffs acknowledge that a non-objection from OTS was required in order to move forward with any severance policy. Plaintiffs maintain that Second Federal could and should have enacted a less discriminatory severance policy. Notwithstanding these facts, Plaintiffs do not provide any evidence that OTS would not have objected to another severance proposal. Plaintiffs' argument only highlights the fact that there was no other alternative, allegedly less discriminatory, severance policy that Second Federal refused to adopt. Therefore, Second Federal's motion for summary judgment is granted.

**Conclusion**

For the foregoing reasons, Plaintiffs' motion for partial summary judgment as to Counts I and II is denied. Second Federal's motion for summary judgment as to Counts I and II is granted. IT IS SO ORDERED.

_____
Date: August 28, 2014

_____
Sharon Johnson Coleman
United States District Judge

7