# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANA PALOMARES, JAIME CAMARENA, FLORINDA MUNOZ, SILVIA ROSALES, LILIANA SERRANO, JOSEPHINE SANCHEZ and GILBERT SANCHEZ, <br> Plaintiffs, <br> v. <br> SECOND FEDERAL SAVINGS and LOAN ASSOCIATION OF CHICAGO d/b/a SECOND FEDERAL SAVINGS, <br> Defendant. | Case No. 10 CV 6124 <br><br> Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

Defendant Second Federal Savings and Loan Association of Chicago d/b/a Second Federal Savings ("Second Federal") moves for summary judgment against plaintiffs' individual claims: Ana Palomares [Dkt. 131] claims age, sex, and gender-stereotyping discrimination (Counts III, IV, V, VI, VII, and VIII of her amended complaint); Florinda Munoz [Dkt. 110] claims age and gender-stereotyping discrimination (Counts III, IV, V, and VI of her amended complaint); Silvia Rosales [Dkt. 118] claims age and gender-stereotyping discrimination (Counts III, IV, V and VI of her amended complaint); Liliana Serrano [Dkt. 114] claims retaliatory discharge (Count III of her amended complaint); Josephine Sanchez [Dkt. 126] claims national origin discrimination, age discrimination, and retaliatory discharge (Counts III, IV, V, VI, and VII of her amended complaint); and Gilbert Sanchez [Dkt. 122] claims age discrimination (Count III and IV).[1] For the reasons contained herein, Second Federal's motions for summary judgment are granted as to all plaintiffs.

**Legal Standard**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning

---

[1] Second Federal also filed a separate motion for summary judgment [Dkt. 105], and plaintiffs' filed a partial motion for summary judgment, regarding plaintiffs' severance claims (Counts I and II of plaintiffs' amended complaints). A separate decision as to Counts I and II is being issued contemporaneously with this Opinion and Order.

material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. When there is no genuine issue of material fact and it is clear that plaintiffs cannot satisfy the legal requirements of their claims, summary judgment is not only appropriate, but mandatory. FED. R. CIV. P. 56(a); *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 900 (7th Cir. 2005).

**Background**

The following facts are undisputed. Second Federal had been in significant financial stress for several years prior to 2009. Pursuant to a reduction in force ("RIF"), Second Federal terminated 20 employees on September 8, 2009. All 20 employees, including the seven plaintiffs herein, were offered severance packages pursuant to the severance plan. All seven plaintiffs are of Hispanic/Latino descent.

Jaime Camarena was employed by Second Federal from about May 7, 1996 until September 8, 2009 as a full-time Assistant Vice President. Camarena's direct supervisor was Joan Batcha ("Batcha"), Chief Lending Officer for Second Federal, and Dolores Pekala ("Pekala"), Vice President of Second Federal.

Ana Palomares was employed by Second Federal from about April 19, 1999, until September 8, 2009, as a full-time loan officer. At the time of her discharge, Palomares was 41 years old and the primary caregiver for her six minor children. Three of her children were born during the time she worked at Second Federal - in July 2001, December 2003, and March 2008. Batcha was Palomares' direct supervisor. Around March 2008, Batcha commented amongst a group of men and women that female employees should not get pregnant. Batcha did not direct this comment at anyone in particular. Batcha made these comments a total of two or three times over the five years that she supervised Palomares.

Florinda Munoz was employed by Second Federal from about December 1979 until September 8, 2009, and spent the latter end of her employment in Second Federal's mortgage department as a full-time loan closer. At the time of her discharge, Munoz was 45 years old and

the primary caregiver for her two minor children. Batcha was Munoz's direct supervisor. Munoz heard Batcha, while in a group with both men and women present, laugh and say that women should not get pregnant and should use birth control pills.

Silvia Rosales was employed by Second Federal from about August 1986, until September 8, 2009, as a full-time accounting clerk. At the time of her discharge, Rosales was 43 years old and the primary caregiver for her two minor children. Batcha was Rosales' direct supervisor. Rosales never heard Batcha's comments directly; she received all of her information regarding Batcha's statements second-hand from Munoz on one occasion.

Liliana Serrano was employed by Second Federal from about January 4, 2001, as a full-time bank teller. Serrano's direct supervisor was Mayra Garza ("Garza"), Branch Manager for Second Federal. Serrano observed several conditions in the building at Second Federal while she worked there, including paint chipping, holes in the ceiling, foul odors, flooding, exposed wires and holes in the wall. Serrano also believes she saw mold, but she never tested the substance. She had no health problems as a result of these conditions nor did she seek any medical treatment related to them.

Josephine Sanchez ("Ms. Sanchez")[2] was employed by Second Federal from about January 23, 1978 until September 8, 2009 as a full-time insurance clerk. At the time of her discharge, Ms. Sanchez was sixty-nine years old. Pekala was Ms. Sanchez's direct supervisor. Prior to 2003, Ms. Sanchez never reported to anyone at Second Federal that she was having health issues as a result of something at work. In September of 2003, Ms. Sanchez's doctor sent a letter to Mark Doyle and Nadine Simko, a member of the board of directors, stating that Ms. Sanchez suffered from various allergy symptoms and concluded that the symptoms were a result of mold exposure at work. In response to the letter, Second Federal moved Ms. Sanchez to a new work area on an upstairs floor. After the move, Sanchez's condition improved, she did not complain about her new work area, and she did not encounter any disciplinary actions for requesting the move. On one occasion in 2003, Ms. Sanchez complained to Pekala that she would cough whenever she went downstairs to file or escort customers. Pekala told Ms. Sanchez to have another employee do those duties instead. Ms. Sanchez was not disciplined for her complaint to Pekala. In March or April 2009, Ms. Sanchez was asked to do work inside the vault

---

[2] Because two plaintiffs have the surname Sanchez, the Court uses the honorific title of Mr. and Ms. solely to distinguish them.

3

on the first floor of the bank. Shortly thereafter, Sanchez had trouble with her voice and went to Pekala, who told her to go back to her desk and let others finish the work. Ms. Sanchez did not make any reference to mold in her statement to Pekala. Ms. Sanchez was not disciplined in any way after talking to Pekala.

Ms. Sanchez never complained to either Batcha or Westbrook about the conditions at Second Federal or her health issues. Batcha started working at Second Federal after the September 2003 letter from Ms. Sanchez's doctor, and had no knowledge of Ms. Sanchez's medical conditions nor had she ever heard Ms. Sanchez make complaints about the conditions of the workplace. Westbrook never had any knowledge of any health concerns related to Ms. Sanchez or any complaints she made about the condition of the workplace either. At no time during her employment at Second Federal did Ms. Sanchez file a workers' compensation first report of injury or claim. Ms. Sanchez never told anyone at Second Federal that she planned to file a workers' compensation claim. Ms. Sanchez also worked on workers' compensation claims for Second Federal as part of her job, and she never saw a claim that had been submitted on her behalf.

Gilbert Sanchez ("Mr. Sanchez") was employed by Second Federal from about August 1995 until September 8, 2009 as a full-time maintenance professional. At the time of his discharge, Mr. Sanchez was seventy-one years old. Mr. Sanchez's direct supervisor was Gonzalo Gradilla, Vice President of Second Federal.

In addition to their respective direct supervisors, all seven plaintiffs also reported to Mark Doyle, who was the Chief Executive Officer/President of Second Federal up until July 1, 2009. Thereafter, Hunter Westbrook, became the interim CEO/President of Second Federal. Westbrook was the interim CEO/President of Second Federal at the time of the RIF, and was permanently promoted to those positions in March 2010.

With the exception of Mr. Sanchez, each employee was evaluated via a documented multi-factored assessment of their respective job performances, and their cumulative score was amongst the lowest of their respective job group.

On March 4, 2010, Plaintiffs filed formal charges of discrimination with the Illinois Human Rights Department ("IHRD") and with the Equal Employment Opportunity Commission

("EEOC").[3] Plaintiffs received their right to sue letters from the EEOC on August 25, 2010. The IHRD failed to issue a report of findings within 365 days. Plaintiffs filed their initial complaints on September 24, 2010, which were amended on August 16, 2011.

While Camarena only alleges discrimination regarding his severance package, the other six plaintiffs filed one or more additional claims for relief. Specifically, Serrano and Ms. Sanchez allege retaliatory discharge, in violation of Illinois law; Josephine Sanchez solely makes a claim of discrimination based on national origin/ancestry, in violation of Title VII and the IHRA; Ana Palomares solely alleges discrimination based on sex, in violation of Title VII and the IHRA; Palomares, Munoz, Rosales, Mr. Sanchez, and Ms. Sanchez allege discrimination based on age, in violation of The Age Discrimination in Employment Act, 29 U.S.C. §621 ("ADEA") and the Illinois Human Rights Act, 775 ILCS 5/2-101 *et seq*. ("IHRA"); and Palomares, Munoz, and Rosales allege gender-stereotyping, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. ("Title VII") and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq*. ("IHRA").

Plaintiffs' duplicate claims under the IHRA are analyzed under the same legal standards employed by the federal courts in actions brought under Title VII and other anti-discrimination statutes. *Zaderaka v. Ill. Human Rights Comm'n*, 131 Ill. 2d 172, 178-79, 545 N.E.2d 684 (1989). Second Federal moves for summary judgment on all claims in plaintiffs' amended complaints. The Court analyzes each claim in turn below.

**Discussion**

*I. Retaliatory Discharge Claims*

Second Federal moves for summary judgment on Counts III and VII of Serrano's and Ms. Sanchez's respective amended complaints alleging retaliatory discharge in violation of Illinois law, arguing that no genuine issue of material facts exists as to the required element of a causal relationship.

To prevail on the claim of retaliatory discharge, plaintiffs must each establish that they were (a) discharged; (b) in retaliation for their respective complaints; and (c) that the discharge "violates a clear mandate of public policy." *See Turner v. Mem'l Med. Ctr.,* 233 Ill. 2d 494, 500, 911 N.E.2d 369, 374 (2009). Not only must all three elements exist, but plaintiffs must prove

---

[3] Plaintiffs subsequently filed technical amendments correcting their formal charge with the IDHR and EEOC from discrimination based upon race to discrimination based upon ancestry.

that a causal relationship exists amongst them. *Webber v. Wright & Co.*, 368 Ill.App.3d 1007, 1021, 858 N.E.2d 579, 592 (1st Dist. 2006) (citations omitted). Without plaintiffs proving this, Second Federal is entitled to judgment as a matter of law.

Second Federal argues that plaintiffs do not have sufficient proof of causation because (1) Second Federal had legitimate and non-pretextual reasons for their termination, (2) plaintiffs complaints were never raised with or known by a decision maker prior to their termination, (3) plaintiffs never reported any actual health hazards, and (4) Ms. Sanchez specifically never filed a workers' compensation claim and her 2003 doctor's letter regarding the possible existence of mold at Second Federal was too remote in time from her termination to have motivated it.

Serrano alleges that Second Federal terminated her employment because she complained about numerous health and safety hazards occurring in the workplace, including mold growing on both the walls and carpet in certain areas, water damage from flooding and/or leaking, peeling paint on the walls in certain areas, odors from sewage back-up, and asbestos. She claims that from the date of her hire, January 4, 2001, through the date of her termination, September 8, 2009, she was concerned for her health due to the workplace environment, and that she made numerous complaints to Garza, her direct supervisor.

Ms. Sanchez alleges that Second Federal discharged her because of her continuous reports to Pekala about hazardous health and safety conditions in the workplace and she claims that Second Federal failed to remediate the issues. Ms. Sanchez further alleges retaliation because Second Federal knew she initiated a worker's compensation claim against the company for her medical complications, which she alleges are a result of her exposure to the unsafe workplace conditions.

The Court finds that both Serrano and Ms. Sanchez have failed to establish a sufficient showing of a causal relationship between their complaints and their discharge. *See Sherman v. Kraft General Foods, Inc.,* 272 Ill. App. 3d 833, 840, 651 N.E.2d 708 (1995). It is undisputed that Serrano made her first complaint about the building conditions in 2005. That same year, she again complained about the workplace conditions, yet no action was ever taken against her. Not until July of 2009 does Serrano allege to have again complained, this time regarding flooding that occurred in the branch basement, and she contends that her complaints made four years apart are the reason for her discharge.

Similarly, it is undisputed that Ms. Sanchez began regularly complaining to her supervisor, Pekala, starting as early as 2001 of the various health hazards she observed. Ms. Sanchez submitted a doctor's note in 2003 regarding her allergies and the possible existence of mold to Doyle and Simko, although it is undisputed that Westbrook and Batcha were the RIF decision-makers. Years after her initial complaints, Ms. Sanchez alleges she complained yet again to Pekala, and it is her contention that these complaints, in addition to the ones she made prior and along with her initiation of a workers' compensation claim for a hazardous workplace, are the cause for her discharge.

Based on the evidence above, the Court finds the claims presented by both Serrano and Ms. Sanchez speculative at best. *See Payne v. Pauley,* 337 F.3d 767, 773 (7th Cir. 2003). Conclusory allegations, unsupported by specific facts, will not suffice. *Id.* Serrano's portrayal of a connection between her July 2009 complaint of flooding in the branch basement and the earlier complaints leading in tandem to her termination are merely subjective statements. Although "temporal proximity is only evidence of causation, not a separate element of the prima facie case [for retaliation]," plaintiff still fails to provide the court with any other evidence demonstrative of a causal connection between her complaints and her discharge. *Lalvani v. Cook County., Ill.,* 269 F.3d 785, 791 (7th Cir. 2001).

As stated above, Ms. Sanchez alleges that she regularly complained to her supervisor about hazardous workplace conditions between 2001 and 2003, prior to her 2009 complaints and termination. However, Ms. Sanchez never filed a workers' compensation claim. Her allegation that Second Federal knew of her intention to file and retaliated against her is speculative at best and bold fabrication at worst. With no actual filing of a workers' compensation claim to put the decision-makers at Second Federal on notice, Ms. Sanchez offers zero evidence of retaliation. Her reliance on a 2003 doctor's note has no weight due to its remoteness in time, as well as the undisputed fact that it never reached any decision-maker of the RIF. Speculation cannot defeat summary judgment. *Payne,* 337 F.3d at 773.

Moreover, Second Federal has provided a non-retaliatory reason for Serrano and Ms. Sanchez's termination - the decision to execute a RIF in order to combat financial issues, and a job-related performance evaluation resulting in the identification of Serrano and Ms. Sanchez as the lowest performers - which the Court finds to be a valid, non-pretextual basis for discharging employees. The Court finds that both Serrano and Ms. Sanchez have failed to provide any

evidence that Second Federal decided to retaliate against them for their complaints. *See Crampton v. Abbott Laboratories*, 186 F. Supp. 2d 850, 856 (N.D. Ill. 2002). For all these reasons, Second Federal is entitled to judgment as a matter of law as to each plaintiff.

## II. National Origin/Ancestry Discrimination Claim

Second Federal moves for summary judgment on Counts III and IV of Ms. Sanchez's amended complaint alleging national origin/ancestry discrimination, arguing that no genuine issue of material facts exists. Ms. Sanchez alleges discrimination based on her national origin/ancestry, in violation of Title VII and IHRA because she is of Latino/Hispanic descent and was terminated from her position as an insurance clerk, while a non-Latino employee, retained her employment as an insurance clerk. To prevail on this claim, Ms. Sanchez must produce either direct or indirect evidence that creates a triable issue on whether discrimination motivated her termination. *Diaz v. Kraft Foods Global, Inc*., 653 F.3d 582, 587 (7th Cir. 2011).

There is no dispute that Second Federal has made no admissions and that Ms. Sanchez has no direct or circumstantial evidence that her termination was triggered by discriminatory animus. Accordingly, the Court shifts to the indirect method of proof.

To succeed under the indirect method, Ms. Sanchez must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Ms. Sanchez must prove that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) her job duties were absorbed by employees who were not members of her protected class. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008) (citations omitted).

If Ms. Sanchez establishes a *prima facie* case of discrimination, the burden then shifts to Second Federal to articulate a legitimate, non-discriminatory reason for her termination. *McDonnell Douglas,* 411 U.S. at 802. To satisfy this burden, Second Federal need not show that it had a "good reason" for its decision to terminate Ms. Sanchez, but only that it was not motivated by discriminatory animus towards her national origin or ancestry. *Coleman,* 667 F.3d at 852. If Second Federal meets this burden of proof, Ms. Sanchez must then establish that there is an issue of material fact as to whether Second Federal's "proffered reasons are merely pretext for unlawful discrimination or retaliation, in order to survive summary judgment." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004).

Second Federal does not dispute that Ms. Sanchez has established a *prima facie* case of national origin discrimination under *McDonnell Douglas*. However, Second Federal maintains that Ms. Sanchez was terminated because of Second Federal's board of directors' decision that a RIF would be a cost-saving option in light of its ongoing financial issues. In addition, Ms. Sanchez had the lowest evaluation score of the two clerks left at the time of the RIF. As a result, Second Federal contends that Ms. Sanchez was identified for discharge not because of her national origin or ancestry but because of an economically motivated RIF and her low performance.

Because Second Federal provides a non-pretextual reason for Ms. Sanchez's discharge, she must provide evidence that Second Federal's proffered rationale completely lacks a factual basis, and, instead, Second Federal did so because she is of Latino/Hispanic descent. *See Ghosh v. Indiana Dept. of Environmental Management,* 192 F.3d 192 F.3d 1087, 1092 (7th Cir. 1999). Ms. Sanchez admits that financial problems may have necessitated the RIF, however, she argues that the RIF was thereafter used as a pretext for discrimination. Specifically, she asserts that the procedure employed by Second Federal allowed supervisors to subjectively choose which employees to recommend for termination without requiring them to review any supporting documentation, such as employee personnel files, and this process allowed discriminatory conduct to go unchecked.

Second Federal contends that a cross-checking process was implemented in order to account for any bias, and beyond offering a self-serving opinion that she was just as qualified as the retained employee, Ms. Sanchez offers no evidence that Second Federal's business decision that her position could be eliminated was done in bad faith, under false pretenses, or with any discriminatory intent. Regardless, "it is 'not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.'" *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir. 2005) (quoting *Ransom v. CSC Consulting, Inc.,* 217 F.3d 467, 471 (7th Cir. 2000).

The Court finds that Second Federal's decision was not pretextual because Ms. Sanchez admits that economic reasons likely necessitated the RIF, and she provides no evidence beyond her subjective opinion that the RIF was performed in a discriminatory manner. Ms. Sanchez has failed to provide the Court with specific facts that call into question the veracity of Second

Federal's proffered nondiscriminatory explanation. Accordingly, Second Federal is entitled to judgment a matter of law as to Ms. Sanchez's claim for national origin/ancestry discrimination.

*III. Sex Discrimination Claim*

Second Federal moves for summary judgment regarding Palomares' sex discrimination claim, arguing no genuine issue of material facts exists. Palomares alleges discrimination based upon her sex, in violation of Title VII and IHRA because she was terminated from her position as a loan officer, while two male employees, retained their employment as loan officers. To survive summary judgment on this claim, Palomares must produce either direct or indirect evidence that creates a triable issue on whether discrimination motivated her termination. *Diaz,* 653 F.3d at 587 (7th Cir. 2011). The Court finds that Palomares has no direct or circumstantial evidence that her termination was triggered by discriminatory animus. *Id.* Accordingly, the Court shifts to Palomares' indirect method of proof.

There is no dispute that Palomares has a *prima facie* case of sex discrimination under *McDonnell Douglas*. However, Second Federal argues, once again, that its decision that a RIF would be a cost-saving option in light of its ongoing financial problems is a non-discriminatory reason for Palomares' termination. Palomares scored the lowest amongst her peer loan officers, which resulted in Second Federal identifying her for the RIF.

Because Second Federal provides a non-pretextual reason for Palomares' discharge, she must now provide evidence that the proffered non-discriminatory rationale completely lacks a factual basis, and, instead, is because she is a woman. *See Ghosh v. Indiana Dept. of Environmental Management,* 192 F.3d 1087, 1092 (7th Cir. 1999).

Identical to Ms. Sanchez's reasoning immediately above, Palomares admits that financial problems may have necessitated the RIF, but contends that it was thereafter used as a pretext for sex discrimination. Likewise, Palomares offers no evidence, beyond her own opinion as to her qualifications, that Second Federal's business decision to eliminate her position was done in bad faith, under false pretenses, or with any discriminatory intent. Palomares undermines her own argument because she too admits that economic reasons likely necessitated the RIF, yet provides no evidence that the RIF was performed in a discriminatory manner. It is Palomares' burden to prove pretext. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011).

Palomares fails to provide the Court with specific facts that call into question the veracity of Second Federal's proffered nondiscriminatory explanation. Accordingly, Second Federal is entitled to judgment a matter of law as to Palomares' claim for sex discrimination.

*IV. Age Discrimination Claims*

Second Federal moves for summary judgment regarding the age discrimination claims of Palomares (Counts III and IV), Munoz (Counts III and IV), Rosales (Counts III and IV), Mr. Sanchez (Counts III and IV), and Ms. Sanchez (Counts V and VI), in violation of ADEA and the IHRA.

To survive summary judgment on these claims, plaintiffs must produce either direct or indirect evidence that creates a triable issue on whether age discrimination motivated their termination. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Second Federal argues that none of the plaintiffs have direct or circumstantial evidence that their termination was triggered by discriminatory motives. The Court agrees.

Second Federal does not dispute that plaintiffs have established a *prima facie* case of age discrimination via the indirect method of the *McDonnell Douglas* test. However, Second Federal maintains its non-discriminatory reason for plaintiffs' termination was Second Federal's board of directors' decision that a RIF would be a cost-saving option during a time of financial trouble. With the exception of Mr. Sanchez, Second Federal performed a multi-factored evaluation of each of the plaintiffs' positions, and plaintiffs were amongst the lowest scorers. Mr. Sanchez was not identified for termination due to a low job performance evaluation; instead Second Federal maintains that it determined his position as mainly the handyman/maintenance man (vs. a janitor that solely cleans) was unnecessary because the work could be contracted out at a lower price when needed. Thus, plaintiffs were identified and discharged along with 15 other employees for non-discriminatory reasons.

Because Second Federal provides a non-pretextual reason for plaintiffs' discharge, plaintiffs must now provide evidence that the proffered non-discriminatory rationale completely lacks a factual basis, and, instead, Second Federal did so because of their age. *See Ghosh v. Indiana Dept. of Environmental Management,* 192 F.3d 192 F.3d 1087, 1092 (7th Cir. 1999). Again, however, plaintiffs each admit that the RIF may have been financially necessary, and fail to provide any specific facts, beyond offering their own personal opinions of disparate treatment

11

due to their age, that Second Federal's decision to eliminate their positions was done in bad faith, under false pretenses, or with any discriminatory intent.

The Court finds plaintiffs' arguments unpersuasive, first because they each admit that economic reasons likely necessitated the RIF, and second because they fail to provide any evidence of pretext. The Court's duty is not to determine whether Second Federal's reasons for its RIF were right, but whether its reasons were honest. *See Kariotis v. Navistar Int'l Trucking Corp.*, 131 F.3d 672, 677 (7th Cir. 1997). Accordingly, Second Federal is entitled to judgment a matter of law as to Plaintiffs' claims for age discrimination.

*V. Gender-Stereotyping Discrimination Claims*

Second Federal moves for summary judgment regarding the gender-stereotyping claims of Palomares (Counts VII and VIII), Munoz (Counts V and VI), and Rosales (Counts V and VI), in violation of Title VII and IHRA.

Plaintiffs allege they were each selected for layoff because they have a primary care-giving responsibility for their minor children. Plaintiffs' allegations are often referred to as Family Responsibilities Discrimination ("FRD"), discrimination that is based on biases about how employees with family caregiving responsibilities will or should act in the workplace. *See Lust v. Sealy, Inc.*, 277 F. Supp. 2d 973, 982 (W.D. Wis. 2003) *aff'd as modified,* 383 F.3d 580 (7th Cir. 2004). When a party alleges FRD, and the bias is based on a gender stereotype, those claims are evaluated as discrimination claims under Title VII, as Title VII guards against discrimination based on gender as well as family status. *Stern v. Cintas Corp.*, 319 F. Supp. 2d 841, 858 (N.D. Ill. 2004).

As explained above, plaintiffs must produce either direct or indirect evidence that creates a triable issue on whether discrimination motivated their termination to survive summary judgment. *Diaz,* 653 F.3d at 587 (7th Cir. 2011). "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).

Second Federal argues that it has made no admissions and that plaintiffs have no direct or circumstantial evidence that their termination was triggered by discriminatory animus. Plaintiffs contend, however, that they have direct evidence of FRD by Second Federal as each plaintiff claims that Batcha, their supervisor and the decision maker for their selection in the RIF, made comments to them regarding women getting pregnant and having children. Specifically,

12

plaintiffs allege that from around January 2004 through the date of their discharge on September 8, 2009, Batcha frequently made such comments to plaintiffs, including: (a) that female employees at Second Federal should not get pregnant, (b) that female employees at Second Federal should use contraceptives, including birth control pills, and (c) that female employees at Second Federal with children do not perform as well as female employees without children.

Second Federal argues that Batcha's statements are not actionable because they are just random remarks. Second Federal underscores Palomares' deposition testimony in which she states that Batcha did not reference any specific employees when making such remarks, but instead she "would say it in a group". (Dkt. #134-1, Palomares Dep. 172:20-21.) Also, Second Federal points out that Palomares laughed while testifying about the remarks Batcha would make. When asked why she was laughing, Palomares said "[i]t's not funny what she would say, but it would be funny how she could have a conversation and all of a sudden just throw-- you'd better not get pregnant or things like that." (*Id.* at 172:10 -173:10.) Additionally, Second Federal argues that no employee suffered any adverse employment action as a result of said comments, and directs the Court to *Steinhauer v. DeGolier*, 359 F.3d 481, 487-88 (7th Cir. 2004), which held that a decision maker's comment not made to plaintiff, made in passing, and unrelated to any employment decision was not sufficient evidence of discriminatory intent.

The Court finds that Batcha's statements do not amount to direct evidence of discrimination. A remark can raise an inference of discrimination when it "was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). But, "[i]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006).

Batcha's remarks were not made around the time of the decision, nor were they made in reference to the RIF. Neither did the remarks refer to a specific employee or employees. Had the remarks reflected some discriminatory animus on the part of Batcha or any Second Federal manager toward plaintiffs, it would be reasonable to expect that at various stages of pregnancy or young motherhood, plaintiffs would have been disciplined or terminated. However, plaintiffs all continued to be employed until roughly five years later when they were terminated along with 17 other employees. The conclusion that Batcha's comments were only random remarks, albeit

13

neither humorous nor work appropriate, is further supported by the fact that other women who were primary caregivers for their minor children continued to be employed after the RIF. (Dkt. #134-1, Palomares Dep. 168:22 -170:16.) Such undisputed facts do not create any reasonable inference of discriminatory intent. *See Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (decision maker's gender-related comment made more than a year before termination was not evidence of discrimination). Thus, plaintiffs' direct method of proof is insufficient to create an issue to defeat summary judgment.

With regard to plaintiffs' indirect method of proof, their gender-stereotyping discrimination claims fail for the same reason as plaintiffs' other discrimination claims: there is absolutely no evidence that Second Federal's reasons for their termination were pretextual. Accordingly, the Court finds no genuine issue of material fact and Second Federal is entitled to judgment a matter of law as to plaintiffs' claims for gender-stereotyping discrimination.

**Conclusion**

For the reasons stated herein, even when viewing all reasonable inferences and resolving all evidentiary conflicts in the light most favorable to plaintiffs, the undisputed facts demonstrate that no genuine issue of material fact exists on any of the claims presented. Accordingly, Second Federal is entitled to judgment as a matter of law. This Court grants the motions for summary judgment as to all plaintiffs. [Dkt. Nos. 110, 114, 118, 122, 126, and 131].

IT IS SO ORDERED.

Date: August 28, 2014

Entered